**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5835-17T4

N.J. and R.J.,[1]

     Plaintiffs-Respondents,

v.

SAYREBROOK VETERINARY
HOSPITAL, and A WALSH
IMAGING, INC.,

     Defendants-Respondents.

_____

HELMSMAN MANAGEMENT
SERVICES,

     Appellant.

_____

       Argued October 2, 2019 - Decided November 1, 2019

       Before Judges Yannotti and Firko.

       On appeal from the Superior Court of New Jersey, Law
       Division, Middlesex County, Docket No. L-5361-15.

---

[1] In this opinion, we use initials and pseudonyms to identify plaintiffs, in order to protect their privacy interests.

Christopher John Carlson argued the cause for appellant (Capehart & Scatchard, PA, attorneys; Christopher John Carlson, of counsel and on the briefs).

Eugene S. Wishnic argued the cause for respondent N.J. (Wishnic & Jerushalmy, attorneys; Eugene S. Wishnic, on the brief).

Peter James Hendricks argued the cause for respondent R.J. (Hendricks & Hendricks, attorneys; Peter James Hendricks, on the brief).

Jennifer Mary Bruder argued the cause for respondent A Walsh Imaging (Haworth Barber & Gerstman, LLC, attorneys; Jennifer Mary Bruder, on the brief).

PER CURIAM

Helmsman Management Services, Inc. (Helmsman) appeals from an order entered by the trial court on May 21, 2018, which allocated the proceeds of the settlement in this matter between plaintiffs N.J. (Nina) and her spouse R.J. (Robert).[2] Helmsman also appeals from an order dated July 6, 2018, which denied its motion for reconsideration. We reverse and remand the matter to the trial court for further proceedings.

I.

---

[2] Helmsman is a third-party administrator, which handled Nina's workers' compensation claim on behalf of Sayrebrook Veterinary Hospital (Sayrebrook).

2

On September 25, 2013, Nina suffered personal injuries when an X-ray machine allegedly fell off a wall at Sayrebrook, where she was employed. Nina filed a claim petition seeking workers' compensation benefits, alleging she had been injured during the course of her employment.

Thereafter, plaintiffs filed a complaint in the Law Division, which they later amended. In the complaint, plaintiffs asserted claims against A Walsh Imaging, Inc. (Walsh).[3] Nina alleged Walsh negligently installed the X-ray machine and, as a result of its negligence, she sustained severe, permanent injuries. Robert asserted a per quod claim against Walsh, alleging that as a result of its negligence, he was deprived of Nina's services, society, and consortium. Plaintiffs sought compensatory damages, interest, counsel fees, and costs.

Plaintiffs and Walsh thereafter reached a settlement and executed a confidential release, which stated that plaintiffs would be paid a specified sum in exchange for their agreement to release Walsh and certain entities from any claims arising from or related to the September 25, 2013 accident. In the release, plaintiffs also agreed to pay or otherwise satisfy any liens related to the accident.

---

[3] Plaintiffs named Sayrebrook as a defendant solely for the purpose of obtaining discovery.

A-5835-17T4

The release did not, however, allocate the settlement monies between Nina and Robert.

Robert subsequently filed a motion in the trial court to allocate twenty-five percent of the settlement proceeds to his per quod claim. Helmsman opposed the motion, arguing that our decision in Weir v. Market Transition Facility of N.J., 318 N.J. Super. 436 (App. Div. 1999), did not permit the apportionment requested. Helmsman also argued plaintiffs were attempting to circumvent the right to enforce the lien established by the Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to -142, for the benefits paid to Nina. On May 15, 2018, the trial court conducted an evidentiary hearing on the motion.

Robert testified that he is forty-one years old and has been married to Nina for sixteen years. He stated that before the accident, Nina worked as a veterinary technician. He is employed as a pumping-station repairman. Robert testified that since the accident, he has had to perform virtually all of the household chores. He cooks, cleans, does the laundry, and takes care of plaintiffs' animals. According to Robert, plaintiffs have eight cats and one dog. Before her accident, Nina performed ninety-five to ninety-seven percent of these tasks.

Robert stated that in the accident Nina sustained injuries that required cervical fusion surgery. Since the accident, Robert has driven Nina to most of her doctor's

appointments. He assists her with her personal hygiene. He helps her get dressed and move about the house, if needed. He performs these functions each day. Before the accident, Nina would shop for food, but after the accident, Robert does the food shopping.

Robert said that since the accident, he feels like a caretaker and does not feel as if he and Nina have a marriage "per se." He commented that emotionally, "[Nina's] not really there." He said she "always hurt[s]." Robert also said that he and Nina do not "really have a physical relationship, at all." According to Robert, they had sexual relations once in the previous ten months.

Robert further testified that Nina has headaches, gets dizzy, and becomes nauseous every day. After she was injured, they went to Florida twice, but she became ill during both trips. He explained that Nina has problems walking, and he assists her walk "pretty much everywhere." Before the accident, he and Nina had a very active lifestyle. Since the accident, Nina has become "somewhat" like a recluse, and she prefers to stay at home. He said this has been "taxing" upon him.

Counsel for Helmsman cross-examined Robert. Robert explained that his son, who is twenty-three years old and resides at home, occasionally takes the dog out and may have helped with certain household chores. He said his son has never done the food shopping or the laundry. On re-direct, Robert stated that before Nina was

injured, they went to Florida several times.  He also stated that before the accident, they were "regularly intimate."  In addition, they would occasionally socialize with friends or family.  Robert said he cuts Nina's hair because she has anxiety and does not like to leave the house.

Nina testified that before the accident, her "life was awesome."  She and Robert "did everything."  She enjoyed her job and would go with Robert on day trips and vacations.  They were "constantly doing things" with family members.  She explained that she enjoyed vacationing, gardening, and doing housework.  Robert would participate in gardening and everything involving the animals.  They would often go out to dinner.

Nina also stated that she suffered a traumatic brain injury in the accident, and since the accident, she has been dealing with post-concussion syndrome.  She had herniated disks in her neck, which led to a cervical fusion.  She also has memory loss and concentration issues.  She stated that she is "very unsteady" on her feet and dizzy and nauseous "all the time."  She has no appetite and "vision issues."

Nina further testified that she has not worked since the accident.  She cannot participate in surgery or help ensure that an animal survives a procedure.  She cannot lift "things."  Before the accident, she did "everything" around the house, including cooking, cleaning, laundry, yard work, and taking care of the animals.  Nina stated

6

that since the accident, she has not been able to perform these tasks. She explained that her son does not really help out around the house. She testified that since she was injured, she is afraid to drive, but she drives herself to the doctor if no one else is available. When driving, she sometimes has to pull over because she gets dizzy. She stated that it seems as if she has gone to dozens of doctors.

Nina also explained that before the accident, she and Robert "were a loving couple" and they had a "very active sex life." After the accident, that changed. She said she has "completely lost interest" in sex and does not want any physical contact. She has anxiety and panic attacks because of the headaches, which are constant. She further explained that since the accident, Robert performs all of the housework, cooking, cleaning, and other domestic chores. He has little time for himself. She commented that she heard Robert's testimony, and she did not disagree with anything he said.

Counsel for Helmsman cross-examined Nina. She acknowledged that at her deposition, which was taken in January 2017, she stated that since the accident, there was nothing she has been completely unable to do. She testified, however, that her "circumstances" have changed since then. She is "more housebound" and her pain has increased.

A-5835-17T4

Helmsman's attorney endeavored to ask Nina if it was her intention to maximize the amount allocated to her claim, which is subject to the workers' compensation lien, or maximize the amount allocated to Robert, which is not subject to the lien. Nina's attorney objected.

The judge ruled that Nina could answer the question. She testified she was confused by the question, but commented that she wanted "a fair amount." She also stated that Robert has "suffered through this, too."

At the conclusion of the hearing, the motion judge placed her decision on the record. The judge made the following findings:

> Here, I heard testimony which I found credible from both the husband and wife, [Nina] and [Robert], confirming that [Nina] suffered severe permanent injuries to her neck and a closed head injury, which resulted in extensive treatment to these areas, including cervical fusion surgery and . . . resulted in an inability to work and perform both household and daily activities since the 2013 workers' [compensation] accident, which has recently worsened as a result of perhaps the surgery that occurred in January 2018.
>
> I also found to be credible both the husband's and the wife's account[s] of the loss of the wife's services, society and loss of consortium. These include . . . [Robert] having to perform almost all of the household chores that . . . [Nina] used to perform. [He also provided] daily essential care, such as dressing and assisting in walking.

A-5835-17T4

Also, I found the testimony credible with respect to the substantial impact on the couple's relations as a married couple, including intimacy and loss of society. These would include [the] adverse impact on the sexual relationship and activities that the couple used to enjoy, such as social events, family events, vacations and family relaxation activities with their [pets].

The judge found that allocation of a specified amount of the settlement proceeds to Robert was fair and reasonable. The judge memorialized her decision in an order dated May 21, 2018.

Helmsman thereafter filed a motion for reconsideration. Helmsman again argued that the allocation was contrary to Weir. Helmsman further argued that the court's order was inconsistent with the State's strong public policy, which favors enforcement of workers' compensation liens and precludes an injured worker from obtaining a double recovery for any compensable injuries. The judge entered an order dated July 6, 2018, denying Helmsman's motion. This appeal followed.

II.

On appeal, Helmsman argues that the trial court erred by allocating the settlement proceeds between Nina's and Robert's claims. Helmsman contends our decision in Weir precluded the trial court from making such an allocation. Helmsman maintains Robert's motion was an improper attempt to circumvent the workers' compensation lien, which attaches to Nina's recovery but cannot be

enforced against Robert's recovery. Walsh takes no position on the issues raised by Helmsman, but asserts that the settlement agreement should remain undisturbed.

The WCA generally requires that when a worker is injured in the course of his or her employment, the employer must furnish the injured worker with medical, surgical and other treatment required to cure and relieve the worker of the effects of the injury and to restore the worker's functions "where such restoration is possible; . . . " N.J.S.A. 34:15-15. The "existence of a right of compensation from an employer or insurance carrier" under the WCA does not preclude the employee or the employee's dependents from asserting a claim against a third person, who may be liable for the worker's injury or death. N.J.S.A. 34:15-40.

The WCA provides, however, that an employer or its insurance carrier has a right to reimbursement of its payments from a recovery by the employee or his dependents from a liable third party. The WCA states in pertinent part:

> (b) If the sum recovered by the employee or his dependents from the third person or his insurance carrier is equivalent to or greater than the liability of the employer or his insurance carrier under this statute, the employer or his insurance carrier shall be released from such liability and shall be entitled to be reimbursed as hereinafter provided, for the medical expenses incurred and compensation payments theretofore paid to the injured worker or his dependents less employee's expenses of suit and attorney's fee . . .

A-5835-17T4

(c) If the sum recovered by the employee or his dependents as aforesaid is less than the liability of the employer or his insurance carrier under this statute, the employer or his insurance carrier shall be liable for the difference, plus the employee's expenses of suit and attorney's fee . . . , and shall be entitled to be reimbursed, as hereinafter provided for so much of the medical expenses incurred and compensation payments theretofore paid to the injured employee or his dependents as exceeds the amount of such difference plus such employee's expenses of suit and attorney's fee.

[N.J.S.A. 34:15-40(b), (c).]

The purpose of the reimbursement provided by N.J.S.A. 34:15-40 (the section 40 lien) is to ensure that a worker who sustains injuries during the course of employment is not "compensated twice for those injuries," by receiving workers' compensation benefits and damages from a liable third-party. Weir, 318 N.J. Super. at 444. "The 'double recovery' that the Legislature intended to prevent under [N.J.S.A. 34:15-40] is payment from two different sources for the same injury, and not payment in excess of the worker's 'actual damages.'" Frazier v. N.J. Mfrs. Ins. Co., 142 N.J. 590, 603 (1995).

We have held that "[o]ur public policy against a double recovery is so strong that a section 40 lien is valid even if the recovery in the third-party action is insufficient to compensate the injured employee fully for all injuries received." Weir, 318 N.J. Super. at 444. However, "an employer or its insurance carrier, who

11

has provided workers' compensation benefits to an injured employee, may not assert a section 40 lien against a spouse's per quod recovery obtained in a third-party action." Id. at 445. This is because an injured employee's spouse cannot assert a per quod claim within a workers' compensation proceeding. Ibid. (citing Hauck v. Danclar, 262 N.J. Super. 225, 227-28 (Law Div. 1993)).

As noted, Helmsman argues that our decision in Weir precluded the trial court from allocating the settlement proceeds between Nina's and Robert's claims, where plaintiffs did not make such an allocation when the case was settled. We disagree.

In Weir, the plaintiff was injured in an automobile accident during the course of his employment. Id. at 439. Liberty Mutual Insurance Company (Liberty Mutual), the insurance carrier for the plaintiff's employer, provided workers' compensation benefits to the plaintiff. Id. at 440. The plaintiff then brought suit against a third-party seeking damages for the personal injuries sustained in the accident, and his spouse asserted a per quod claim. Ibid.

The plaintiff and his spouse settled the lawsuit and received a gross net recovery of $168,084.41, but the parties to the action did not allocate the settlement proceeds between the plaintiff and his spouse. Id. at 441-42. The plaintiff did not settle the workers' compensation lien with the carrier. Id. at 446. The plaintiff then

filed an action against Liberty Mutual seeking a judgment allocating a portion of the settlement proceeds to his spouse. Id. at 440.

We held that the portion of the settlement attributable to the spouse's per quod claim is not subject to the lien under N.J.S.A. 34:15-40. Id. at 443-45. We also held that the plaintiffs could not seek a declaratory judgment determining the amount a jury would have awarded to the plaintiff for his injuries if the matter had proceeded to trial. Id. at 447. We stated that "the Declaratory Judgments Act cannot be used to decide or declare the rights or status of parties upon a state of facts which are future, contingent and uncertain." Ibid.

We also stated that although the plaintiff's attorney would be expected to prove to the greatest extent the nature of his client's injuries, plaintiff's attorney had argued in the trial court that the spouse's per quod claim was strong. Id. at 446. Furthermore, the spouse's attorney took no part in the proceeding. Id. at 447.

We added that when the plaintiff and his spouse settled the third-party action, they recognized their obligation to negotiate a resolution of the compensation lien, but less than a week later, initiated the declaratory judgment action to avoid the section 40 lien. Id. at 448. We stated that the action "was

little more than a thinly-veiled attempt to circumvent Liberty Mutual's section 40 lien." Ibid. (quoting Weiner v. Cnty. of Essex, 262 N.J. Super. 270, 280 (Law Div. 1992)).

We are convinced, however, that Weir did not preclude Robert from seeking an allocation of a portion of the settlement proceeds to his per quod claim. This is not a case in which plaintiffs were engaged in a thinly-veiled attempt to avoid the workers' compensation lien, as appeared to be the case in Weir. Indeed, in the release, plaintiffs recognized their obligation to satisfy the section 40 lien.

Here, the settlement resolved all claims in plaintiffs' third-party action, and provided for a gross, lump-sum payment to both plaintiffs. The parties did not allocate the proceeds between Nina and Robert's claims. Plaintiffs could reasonably assume, however, that some part of the recovery was attributable to Robert's claim.

Robert then sought a determination as to the amount of the settlement that pertained to his per quod claim, which under Weir, is not subject to the section 40 lien. The record does not support the conclusion that plaintiffs sought the allocation to avoid payment of the lien, or otherwise obtain a double recovery for Nina for her injuries.

14

Helmsman argues that at the hearing, plaintiffs were not genuine adversaries. Again, we disagree. Plaintiffs are separate parties, who asserted separate claims in this action. In Robert's motion, he was seeking a portion of the single, lump sum settlement payment.

Moreover, at the hearing, Nina did not minimize the impact the injuries have had on her, or exaggerate the effect the injuries have had upon Robert, in order to maximize his recovery. The judge found that both Nina and Robert testified credibly.

Helmsman notes, however, that at the hearing, Robert's attorney did not cross-examine Nina and attempt to reduce the amount allocated to her claim. As we have explained, at the hearing, Helmsman's attorney cross-examined Nina. Robert's attorney may have assumed further questioning was not warranted.

In any event, Helmsman was not prejudiced because Robert's attorney did not cross-examine Nina. As the motion judge pointed out in her decision, Helmsman's attorney had a full and fair opportunity to cross-examine plaintiffs and thereby seek to maximize the amount of the settlement that would be subject to the section 40 lien.

We also note that an allocation of the settlement proceeds did not involve the declaration of rights based on future, contingent and uncertain facts. Here,

Robert asked the court to determine the amount of the settlement that should be allocated to his claim based on testimony presented at the hearing. The court was required to make its own assessment of the amounts that would fairly compensate plaintiffs for their claims, not predict the amounts a jury would have awarded if the case had gone to trial.

We therefore conclude that under the circumstances presented here, Robert was not barred from seeking an allocation of the settlement proceeds between Nina's claim and his per quod claim. Weir does not preclude such an allocation, where, as in this case, plaintiffs were not seeking to circumvent the section 40 compensation lien, and the employer or its insurance carrier has a full and fair opportunity to challenge the allocation and maximize the amount of the settlement subject to the lien.

## III.

Helmsman further argues that the trial court erred by allocating a specified amount of the settlement proceeds to Robert's claim. Helmsman contends the amount allocated to Robert is excessive and inconsistent with the testimony presented at the hearing. We need not address Helmsman's argument. We are convinced that the trial court's order should be reversed for other reasons.

Here, the motion judge reviewed the model jury charge that applies to per quod claims. See Model Jury Charge (Civil), 8.30B, "Loss of Spouse's Services, Society and Consortium" (approved Feb. 1996). The judge then found that allocating $100,000 of the settlement proceeds to Robert was fair and reasonable. We are convinced, however, that the judge should have made the decision using the allocation methodology in Marsella v. Monmouth Medical Center, 224 N.J. Super. 336 (App. Div. 1988).

In Marsella, the plaintiff fell on a walkway at a hospital. Id. at 338. The plaintiff brought an action seeking damages, and her spouse asserted a per quod claim. Ibid. The jury awarded the plaintiff $2000 for medical expenses, $40,000 for her personal injuries, and awarded $1000 to the spouse on the per quod claim. Ibid. The hospital objected and argued that its liability was limited to $10,000. Id at 338-39. The trial court agreed and entered judgment for both plaintiffs for a total of $10,000. Id. at 339.

We held that the spouse's per quod claim was subject to the overall limitation of $10,000, which applied to the plaintiff's claim. Id. at 341. This was so because the per quod claim was "incidental to, dependent on, and derivative of the claim of the injured person." Ibid. We noted, however, that the trial court had awarded $10,000 to the injured plaintiff and her spouse "together." Id. at 342.

We stated that, "[a]lthough it may make no practical difference to these plaintiffs, the judgment should have been made separately in favor of each spouse, dividing $10,000 in the ratio of the amounts of the verdicts in favor of each." Ibid. We are convinced the trial court should have followed that approach in this case.

Here, the judge should have determined the amounts that would have reasonably compensated Nina and Robert on their respective claims. The judge then should have divided the settlement proceeds between Nina and Robert in the ratio of the amounts so determined.

On remand, a different judge should be assigned to the matter. The judge may issue an order providing for such additional discovery as may be required. The judge should conduct a new evidentiary hearing and make the necessary findings of fact and conclusions of law. We express no view as to what the allocation should be.

Reversed and remanded to the trial court for further proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5835-17T4